E–PASS TECHNOLOGIES, INC.,
Plaintiff–Appellant,

v.

3COM CORPORATION (also known
as 3Com, Inc.) and Palm, Inc.,
Defendants–Appellees.

No. 02–1593.

United States Court of Appeals,
Federal Circuit.

Aug. 20, 2003.

Stephen N. Weiss, Moses & Singer LLP, of New York, NY, argued for plaintiff-appellant. With him on the brief was Gregory J. Fleesler.

Bradley J. Hulbert, McDonnell Boehnen Hulbert & Berghoff, of Chicago, IL, argued for defendants-appellees. With him on the brief were George I. Lee and Sean M. Sullivan.

Before CLEVENGER, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

E–Pass Technologies ("E–Pass") appeals the grant of summary judgment of noninfringement of claim 1 of U.S. Patent No. 5,276,311 ("the '311 patent") in favor of 3Com Corporation and Palm Inc. (collectively "3Com"). *E–Pass Techs. v. 3Com Corp.*, 222 F.Supp.2d 1157, 1165 (N.D.Cal. 2002). Because we conclude that the district court's construction of the claim term "electronic multi-function card" was incorrect, and because issues of material fact remain in dispute as to both literal and doctrine of equivalents infringement under the proper construction, we vacate the grant of summary judgment and remand to the district court for further proceedings.

## BACKGROUND

E–Pass is the assignee of the '311 patent, entitled "Method and Device for Simplifying the Use of a Plurality of Credit Cards, or the Like." The object of the invention is to provide a method and device for substituting a single electronic multifunction card for multiple credit cards. The abstract of the '311 patent describes the invention as "an electronic multifunction card comprising a storage accommodating a plurality of individual data sets representing individual single-purpose cards, and comprising at least two display boxes in which data can be displayed by electronic activation." To address problems associated with carrying multiple cards, "the user needs, and is required to carry about, [only] a single card." *Id.* at col. 1, ll. 64–66. The inclusion of the electronic information within the card is described as "comparatively simple since it is in fact easily possible, technologically, to accommodate even very extensive electronic storages in a card-like very flat housing having at least one or a plurality of display windows." *Id.* at col. 2, ll. 22–26. The invention was described as "provid[ing] the advantage of considerable simplification for the individual user and enormous advantages as regards safety against forgery and, generally, abusive use." *Id.* at col. 2, ll. 38–41.

On February 28, 2000, E–Pass filed suit against 3Com alleging infringement of the '311 patent and requesting damages and

injunctive relief. The devices accused of infringement were handheld devices sold under the trademark "Palm Pilot" and referred to as personal digital assistants. In an amended complaint dated March 6, 2000, E–Pass alleged direct, induced, and willful infringement by 3Com. On May 2, 2000, 3Com filed an answer denying infringement and validity and asserted counterclaims of noninfringement and invalidity. On December 5, 2001, the district court issued an order construing the disputed language of claim 1 of the '311 patent, the sole claim at issue in the suit. *E–Pass Techs. v. 3Com Corp.*, 177 F.Supp.2d 1033, 1037 (N.D.Cal.2001). Claim 1 provides:

A method for enabling a user of an electronic multi-function card to select data from a plurality of data sources such as credit cards, check cards, customer cards, identity cards, documents, keys, access information and master keys comprising the steps of:

transferring a data set from each of the plurality of data sources to the multi-function card;

storing said transferred data set from each of the plurality of data sources in the multi-function card;

assigning a secret code to activate the multi-function card;

entering said secret code into the multi-function card to activate the same;

selecting with said activated multi-function card a select one of said data sets; and

displaying on the multi-function card in at least one predetermined display area the data of said selected data set.

'311 patent, claim 1.

The key language in dispute was the phrase "electronic multi-function card."

After reviewing the contentions of both parties, the court construed this phrase to mean "[a] device having the width and outer dimensions of *a standard credit card* with an embedded electronic circuit allowing for the conversion of the card to the form and function of at least two different single-purpose cards." *E–Pass,* 177 F.Supp.2d at 1043 (emphasis added). The standard for credit card dimensions was "set forth in 1971 by the American National Standards Institute ("ANSI") ... [which] established the dimensions of credit cards as having a length of 3.375 inches, a height of 2.2125 inches, and a thickness of 0.030 inches (with tolerances of +/- 0.003 inches)." *Id.* at 1042 (citing *American National Standard Specifications for Credit Cards* at 8 (1971)) ("ANSI Standard").

Following the submission by both parties of motions for summary judgment, the district court on August 12, 2002, granted 3Com's motion for summary judgment of noninfringement both literally and under the doctrine of equivalents and denied E–Pass's motion for summary judgment of infringement under the doctrine of equivalents. *E–Pass,* 222 F.Supp.2d at 1165. As to literal infringement, the court found that "[t]he accused [Palm Pilot] devices have a volume 58 times larger, and a thickness 25 times greater than a credit card." *Id.* at 1162 (internal citation omitted). The court held that "because the accused devices do not meet the credit card size limitation, there is no genuine issue of material fact remaining, and no reasonable jury could find that 3Com's devices literally infringe the '311 patent." *Id.*

On the issue of infringement under the doctrine of equivalents, the district court interpreted the function of the electronic multi-function card as "to simplify the use

of single purpose cards by allowing a user to discard all the various individual credit card size cards she carries about, and in their place, substitute those cards with one similarly sized card." *Id.* at 1163 (internal citation omitted). The court went on to describe this function as the "eliminat[ion of] the bulk of the usual assortment of single-purpose cards." *Id.* The court concluded that "[b]ecause finding that the size of 3Com's device is equivalent to a credit card size card would vitiate the size limitation in the '311 patent, the Court finds that no reasonable jury could find that the size of 3Com's Palm devices are the equivalent to the patented [electronic multi-function card]." *Id.* at 1165.

On April 30, 2003, after E–Pass filed an appeal of the district court's grant of summary judgment in favor of 3Com, the district court issued an order dismissing 3Com's invalidity counterclaims without prejudice. As in *State Contracting & Engineering Corp. v. Florida,* 258 F.3d 1329 (Fed.Cir.2001), "[the] premature notice of appeal ripen[ed] upon" subsequent action by the district court, here the dismissal of 3Com's counterclaims. *See id.* at 1335. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

■ We review the district court's grant of summary judgment without deference. *Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1377 (Fed.Cir. 2002). Issues of claim construction are reviewed as a matter of law without deference. *Id.*

The sole question presented here is whether the district court's construction of the claim term "electronic multi-function card" requiring specific industry standard size dimensions is correct. We hold that it is not, and that summary judgment of noninfringement should not have been granted.

I

■ In order to construe a disputed claim term, we first seek the ordinary meaning of the claim term. *Tex. Digital Sys. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002). We resort initially to the relevant dictionary definitions to determine the ordinary meaning of the term "card." [1] *Id.* Merriam–Webster's provides a relevant definition of "card" as "a flat stiff usu. small and rectangular piece of material (as paper, paperboard, or plastic)." *Merriam–Webster's Collegiate Dictionary* 172 (10th ed.1999). Similarly, Random House provides a relevant definition as "a usually rectangular piece of stiff paper, thin pasteboard, or plastic for various uses." *Random House Webster's Unabridged Dictionary* 313 (2d ed. 1998) ("Random House"). The Oxford English Dictionary provides a relevant definition of "card" as "[a] rectangular piece of stiffened plastic issued by banks or other institutions, with information embossed or otherwise represented." *The Oxford English Dictionary,* vol. 2, at 888 (2d ed.1989).[2] The dictionary definitions provide no specific length, width, or depth measurements, nor do they refer to industry standard dimensions.

---

1. On May 8, 2003, following oral argument in this case, the court issued an order requiring supplemental briefing "identifying the relevant dictionary definition or definitions of the claim term 'card.' "

2. The parties do not suggest that the pertinent definitions have changed from the date of application to the present.

When determining a claim term's ordinary meaning, we also look to the usage of the disputed claim term in context. *Brookhill–Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1300–01 (Fed. Cir.2003). Here, "card" is recited as part of the phrase "electronic multi-function card." There is nothing in the other claim terms defining the recited card (*i.e.,* "electronic multi-function") that suggests a size limitation that departs from the ordinary meaning of "card." The parties do not urge that these terms impose any specific dimensional requirements on the word "card." Thus, the ordinary meaning of the word "card" in the present context is a flat, rectangular piece of stiff material.

The district court relied, in part, upon the credit card industry standard definition to provide an ordinary meaning of the claim term "card." The ANSI standard itself defines its scope as "the physical specifications of embossed credit cards, the specifications for the dimensions and location of embossed data, the type style(s) to be used for embossing the account number line, and an account numbering system." *ANSI Standard* at 7. A subsequent standard issued by the International Standards Organization (ISO) similarly defined standard credit card dimensions. ISO 7810–1985 at 4 (1985). There is no suggestion in the ANSI or ISO standards that they apply outside the limited area of credit cards, *i.e.,* to cards generally or to electronic multifunction cards, or that either was intended to define the term "card" or "electronic multifunction card." It was improper, therefore, for the district court to rely upon the industry standards to provide the ordinary meaning of the term "card" in the context of the '311 patent.

Further, the steps of the method recited in claim 1—which require: "transferring a data set"; "storing said ... data set"; "assigning a secret code"; "entering said secret code"; "selecting ... [a] data set;" and "displaying ... [said] data set"—do not impose any specific dimensional requirements on the recited card.

There is, therefore, no basis in the ordinary meaning of the claim terms at issue or in the other claim language to impose industry standard dimensions as the district court has done.[3]

## II

"Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Sunrace Roots Enter. Co., LTD v. SRAM Corp.,* 336 F.3d 1298, 1302 (Fed.Cir.2003) (quoting *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002)). However, we next look to the specification to determine "whether the presumption of ordinary and customary meaning is rebutted." *Tex. Digital,* 308 F.3d at 1204; *see also Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.,* 309 F.3d

---

3. The patentee conceded before the district court that some size limitation is required, urging that:

It is clear ... from the specification and the object of the invention, that the device to be manipulated according to the steps of Claim 1 must be of a size and weight that a person would comfortably carry with him in lieu of, or as a supplement to, his wallet. Given the clear purpose of the invention

and the unambiguous terminology of the claim language, the contemplated size of the "electronic multi-function card" is the size of *pocket-sized* electronic computers in use on the priority date, March 1, 1989, with the expectation that as technology advanced, the size could be reduced.

(J.A. at 722) (emphasis added). Thus, E–Pass urged that claim 1 be limited in scope to "pocket-sized" devices.

1365, 1371–72 (Fed.Cir.2002). The patentee may have acted as his own lexicographer and imbued the claim terms with a particular meaning or "disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction." *Tex. Digital,* 308 F.3d at 1204.

3Com points us to the statement in the "Advantages of the Invention" section of the '311 patent which states "[p]articular advantages are provided by the *simple form* of the electronic multi-function card *which has the outer dimensions of usual credit or check cards.*" '311 patent, col. 3, ll. 17–19 (emphases added). Elsewhere in the specification the patentee noted that "[credit] cards ... *normally have standardized dimensions.*" '311 patent, col. 1, ll. 18–19 (emphasis added). Interpretation of descriptive statements in a patent's written description is a difficult task, as an inherent tension exists as to whether a statement is a clear lexicographic definition or a description of a preferred embodiment. The problem is to interpret claims "in view of the specification" without unnecessarily importing limitations from the specification into the claims. *Tex. Digital,* 308 F.3d at 1204–05.

█ Thus in determining whether a statement by a patentee was intended to be lexicographic, it is important to determine whether the statement was designed to define the claim term or to describe a preferred embodiment. The patentee here understood that in practice card size varies from the standard, as the words "simple form" and "normally" suggest that the card may deviate from the usual dimensions. Thus, in this context, the statements that the "electronic multi-function card has the outer dimensions of usual credit or check cards" and that credit cards "normally have standard dimensions" suggest a preferred aspect of the invention subject to variability rather than a precise definition.

Further, the patentee described as an aspect of the invention "electronic storages in a card-like very flat housing." *Id.* at col. 2, ll. 24–25 (emphasis added). The fact that the housing must be flat is quite consistent with the ordinary dictionary definitions. To be sure, in explaining how such a flat housing could be practiced, the patentee noted that "this has been practiced before in the form of so-called check-card calculators which perform simple calculation tasks and which only have a thickness *hardly larger that that of usual ... credit cards.*" *Id.* at col. 2, ll. 26–30 (emphasis added). But that is a description of the earlier technology and of a preferred embodiment, rather than a lexicographic definition regarding size. Thus, the specification does not provide a definition of "card" at variance with the ordinary dictionary definitions.

### III

A key aspect of the district court's analysis is based on its interpretation of the "object of the invention" as requiring that the "multi-function card ... *operate[ ] as* a particular single purpose card." *E–Pass,* 177 F.Supp.2d at 1041 (emphasis added). The court noted that the word card was "used over 280 times in the patent ... in reference to a 'plurality of cards' or to specific 'single-purpose' cards that people typically carry ... [or] in reference to the 'electronic multi-function card.'" *Id.* According to the district court it is "[a] matter of common sense" that "if one loaded her present collection of single purpose cards onto the oversized card covered by the plaintiff's interpretation, she would *not*

*be able to buy gas or obtain cash at the ATM." Id.* at 1043 (emphasis added). In order for the card to be used to obtain "cash from [an] ATM" the card would necessarily have to fit into the ATM's card slot. Thus, implicit in the district court's reasoning is a determination that the disclosed card is a functional replacement for a credit card; *i.e.,* the devices (checking terminals) that accept single-purpose cards must interchangeably accept the disclosed card. According to this understanding, in order for this interchangeability to be possible, the disclosed card would necessarily have to comply with the ANSI standard, as that is the standard used to design "checking terminals" (including ATMs) that accept credit cards.

This interpretation requiring interchangeability, however, is directly contradicted by the '311 patent, which states: "there is no need for the magnetic stripe normally existing on the present single-purpose cards." '311 patent, col. 7, ll. 52–53. Instead, the card is disclosed as incorporating "small, outwardly projecting contacts ... or optical, inductive, capacitive or other suitable means" to exchange information with the "checking terminal." *Id.* at col. 7, ll. 27–37. Because embodiments of the disclosed card interface with checking terminals differently from the standard single purpose cards, it would not have been necessary for the disclosed card to share identical interface characteristics with the single purpose cards; *i.e.,* the district court's premise that the electronic multi-function card must be accepted inter-

changeably with standard credit cards is not correct.

 The court also stated that "[a]n invention that requires one to carry one more card of irregular size may have some economic viability as a curiosity, but it can hardly be described as a device 'for simplifying the use of ... credit cards.'" *E–Pass,* 177 F.Supp.2d at 1043 (quoting the abstract of the '311 patent). Similarly, the court premised that "if cards that will be transferred to the multi-function card are credit card-like in size, then it follows that the multi-function card is also intended to be credit card sized." *Id.* at 1041. In other words, the district court sought to limit the claims in light of the perceived purpose served by the invention; *i.e.,* the court concluded that a bulky card could not be within the claim language because a bulky card would not serve the purpose of the invention. The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived "purpose" of the invention. Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution. *See Inverness,* 309 F.3d at 1371–72.[4] An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.[5]

### IV

Thus, the ordinary meaning of the word "card" here, as used in the phrase "elec-

---

4. Where claim language is ambiguous, the purpose of the invention described in the specification may, of course, sometimes be useful in resolving the ambiguity. *See Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.3d 14, 25 (Fed.Cir.2000).

5. The court additionally cited the prosecution history of the '311 patent and inventor testimony in support of the adopted claim construction. *E–Pass,* 177 F.Supp.2d at 1042–43. As to the prosecution history, the purported support was the fact that "[t]he abstract sections from all of the prior art references cited and considered in the prosecution

tronic multi-function card," is the proper construction. Because the grant of summary judgment of no literal infringement was based upon an incorrect construction, the grant of summary judgment was not proper. We note that under the correct construction of "card" in this context—a flat rectangular piece of stiff material—it may be or may not be that the accused Palm Pilot devices literally infringe. At this stage in the proceedings, however, we need not address and do not decide this issue.

As to the district court's disposition of the issue of infringement under the doctrine of equivalents, the district court found that the accused Palm Pilot devices were not equivalent based, essentially, on the distinction in size between the accused devices and the standard credit card. The district court analyzed the accused and claimed devices under the function/way/result and insubstantial difference tests and concluded that "no reasonable jury could find that the size of 3Com's Palm devices [is] the equivalent to the patented [electronic multi-function card]." *E–Pass,* 222 F.Supp.2d at 1163–65. Because this analysis was based on an incorrect claim construction of the "electronic multi-function card" requiring the dimensions of a standard credit card, this issue must be addressed by the district court under the proper construction in the first instance.

## CONCLUSION

Thus, the grant of summary judgment of noninfringement both literally and under

the doctrine of equivalents is vacated. The case is remanded to the district court for further proceedings consistent with this opinion.

*VACATED AND REMANDED.*

### COSTS

No costs.

history, except for one, appear to describe credit card-sized devices." *Id.* at 1042. The cited evidence is insufficient to alter the claim term's ordinary meaning, and 3Com does not here cite this evidence as supporting the district court's claim construction. As to the cited inventor testimony, this court has often repeated that inventor testimony is of little probative value for purposes of claim construction. *See, e.g., Solomon v. Kimberly–Clark Corp.,* 216 F.3d 1372, 1379 (Fed.Cir. 2000).